IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW MALLOUGH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 08-957 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

## I.    **INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Matthew Mallough and Defendant Michael J. Astrue, Commissioner of Social Security. Plaintiff seeks review of final decisions by the Commissioner denying his claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below, Defendant's motion is granted and Plaintiff's motion is denied.

## II.    **BACKGROUND**

### A.    Factual Background

Matthew Mallough was born on December 6, 1978. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," at 108.) Throughout junior and senior high school, Mr. Mallough received learning support classes and therapy for a number of behavioral problems. After dropping out of high school four days before graduation in

1997 (Tr. 313), he worked at a variety of short-term jobs, later telling a psychologist that he had held as many as 75 different jobs. (Tr. 184.)

Plaintiff reported that at some indefinite point, he "just woke up" with pain and a burning sensation that spread from his neck down to his feet. (Tr. 334-335.) In a disability report completed in September 2003, Mr. Mallough stated that by December 2002, his pain was so severe and he was missing work so often, he could no longer work in any capacity. (Tr. 99.)

## B. Procedural Background

On April 30, 2003, Mr. Mallough protectively applied for supplemental security income benefits,[1] alleging disability as of December 25, 2002, due to chronic pain, back problems, peptic ulcers and attention deficit disorder.[2] (Tr. 99.) The Social Security Administration ("SSA") denied Mr. Mallough's application,

---

[1] Plaintiff had applied for benefits in 1997 and 2000; in each case, benefits were denied. (Tr. 362.) Judge Kenworthy concluded these applications need not be reconsidered (Tr. 16) and Plaintiff does not object to that conclusion.

[2] Attention deficit disorder, also known as attention deficit/ hyperactivity disorder ("ADHD"), is a problem of inattentiveness, over-activity, impulsivity, or a combination thereof, usually developing in childhood. Depression, sleep deprivation, learning disabilities, tic disorders, and behavior problems may be confused with, or appear along with, ADHD. About half of all children with ADHD will continue to have troublesome symptoms of inattention or impulsivity as adults. However, adults are often more capable of controlling behavior and masking difficulties. *See* medical encyclopedia at the National Institute of Medicine's on-line website, www.nlm.nih.gov/medlineplus (last visited April 2, 2009), "Medline Plus."

2

in part because he failed to appear for consultative physical examinations as scheduled and in part because his psychological evaluation and intelligence testing showed he had the cognitive ability to maintain employment. (Tr. 44-47.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 24, 2005, before Judge Gordon Malick. Mr. Mallough, who was represented by counsel, testified, as did a vocational expert. (Tr. 359-393.) Judge Malick issued his decision on October 27, 2005, again denying benefits. (Tr. 27-24.)

When Plaintiff appealed this decision, the Social Security Appeals Council remanded the case on April 12, 2006, with directions that the ALJ should (1) resolve the question of whether Plaintiff's level of functioning was in the "mildly retarded" or the "borderline intelligence" range and (2) evaluate the severity of Plaintiff's mental impairments in accord with 20 C.F.R. § 416.920a. The ALJ was directed to obtain additional evidence concerning Mr. Mallough's mental impairments; to consider obtaining evidence from a medical expert as to the nature and severity of his impairments; to evaluate the mental impairments as described in 20 C.F.R. § 416.920a; to discuss whether the impairments meet or equal the criteria of Listings 12.04 or 12.05; to further consider Mr. Mallough's residual functional capacity as appropriate; and, if warranted, to obtain supplemental evidence from a vocational expert

regarding the effect of the assessed limitations on Plaintiff's occupational base.   (Tr. 72-74.)

On March 9, 2007, a second hearing was held, this time before the Honorable William E. Kenworthy.  Mr. Mallough and a vocational expert testified.   (Tr. 329-358.)   On March 15, 2007, Judge Kenworthy issued his decision denying benefits.   The Appeals Council advised Mr. Mallough on June 13, 2008, that it had chosen not to review this decision, finding no reason under its rules to do so.   (Tr. 7-9.)   Therefore, the March 15, 2007 opinion became the final decision of the Commissioner for purposes of review.  42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000).   On July 9, 2008, Plaintiff filed suit in this Court seeking judicial review of the ALJ's decision.

C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

**III. STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and

4

whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v.

5

## IV. ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for
supplemental security income, the burden is on the claimant to show
that he has a medically determinable physical or mental impairment
(or combination of such impairments) which is so severe he is
unable to pursue substantial gainful employment[3] currently existing
in the national economy. The impairment must be one which is
expected to result in death or to have lasted or be expected to
last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(I);
Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). The
claimant must also show that his income and financial resources are
below a certain level. 42 U.S.C. § 1382(a).

To determine a claimant's rights to SSI benefits,[4] the ALJ
conducts a formal five-step evaluation:

(1)   if the claimant is working or doing substantial gainful
      activity, he cannot be considered disabled;

(2)   if the claimant does not suffer from a severe impairment

---

[3]   According to 20 C.F.R. § 416.972, substantial employment is
defined as "work activity that involves doing significant physical or
mental activities." "Gainful work activity" is the kind of work
activity usually done for pay or profit.

[4]   The same test is used to determine disability for purposes of
receiving either disability insurance benefits or SSI benefits. Burns
v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts
routinely consider case law developed under both programs.

6

or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[5] to perform his past relevant work, he is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[6] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Kenworthy first noted that although Mr. Mallough had worked for seven or eight months as

---

[5] Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[6] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

7

a dishwasher in 2005, earning approximately $2,309, this 20-hour per week job did not constitute substantial gainful activity. Thus, he concluded Plaintiff had not engaged in substantial gainful activity since December 25, 2002, his alleged disability onset date. (Tr. 18.) In resolving step two, the ALJ found that Mr. Mallough's severe impairments were limited to borderline intellectual functioning and chronic back pain of undetermined etiology. (Id.) He further concluded that although Plaintiff also suffered from diabetes mellitus, high cholesterol, hypertension, and a gastric disorder, these conditions were reasonably controlled with medication and did not result in any functional limitations at the time. He also noted Plaintiff's past history of mental health therapy as an adolescent and again between March and November 2002. (Tr. 20-21.) Although he did not make an explicit finding with regard to Mr. Mallough's diagnoses of depression, adjustment disorder or antisocial personality disorder,[7] he discussed these

---

[7] Adjustment disorder is an abnormal and excessive reaction to a life stress, e.g., starting school, getting divorced, or experiencing grief. In adolescents, common stressors include family conflict, school problems or sexuality issues. Adults often develop adjustment disorder due to marital or financial problems. Other stressors for people of any age include death of a loved one, general life changes, or unexpected catastrophes.

Antisocial personality disorder is a psychiatric condition in which a person manipulates, exploits, or violates the rights of others, sometimes to the extent of criminal behavior. A person with antisocial personality disorder may break the law repeatedly, lie, steal, disregard the safety of himself and others, or fail to show guilt for his behavior. To receive a diagnosis of antisocial personality disorder, a person must have shown behaviors of conduct disorder during childhood. See medical encyclopedia at Medline Plus.

8

conditions throughout his decision, apparently concluding they were not severe. At step three, the ALJ concluded neither of Plaintiff's impairments, considered singly or in combination, satisfied the criteria of any relevant Listing. That is, Plaintiff's intellectual functioning did not satisfy Listing 12.05 nor did his complaints of chronic musculosketal pain satisfy any of the relevant Listings in 1.00. (Tr. 23.)

At step four, the ALJ concluded Plaintiff retained the residual functional capacity "to perform tasks at the light exertional level, lifting up to 20 pounds occasionally and standing or walking up to six hours out of an eight hour day" as long as those tasks were "of a simple, repetitive nature." (Tr. 23.) At the hearing, the vocational expert, Dr. Samuel Edelmann, had testified that Plaintiff's past work as a janitor was considered light, unskilled work. In addition, there were other jobs which Plaintiff could perform such as a motel cleaner, fast food worker or "off-bearer."[8] (Tr. 26; *see also* Tr. 353-354.) Thus, Judge Kenworthy concluded Mr. Mallough had not been under a disability and was not entitled to benefits at any time between April 30, 2003, the date on which his latest application was filed, and the date of the ALJ's decision. (Tr. 26.)

---

[8] Although the ALJ refers in his decision to the position of "off-bearer," Dr. Edelmann testified that a third possible light unskilled job would be "office cleaner." (Tr. 354.)

9

B.    Plaintiff's Arguments

Mr. Mallough raises four inter-related arguments in his brief in support of his motion for summary judgment. (Plaintiff's Brief, Doc. No. 9, "Plf.'s Brief.") We have combined the redundant arguments and address each of his major points as follows.

1. *The ALJ's credibility determination:* Mr. Mallough first argues that the ALJ erred in his determination that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not fully credible. In particular, he points to the effects that pain, depression, his lack of concentration, and difficulty getting along with others have on his ability to hold a job and on his activities of daily living. (Plf.'s Brief at 3-6.) Mr. Mallough argues that these reports are entirely consistent with his testimony at the hearing and with his reports to Drs. Ray Bullard, John Vigna, and Charles Brown. The ALJ further erred in his credibility analysis by requiring objective findings to support Plaintiff's subjective allegations, in direct contradiction to the guidelines in 20 C.F.R. § 404.1529(c) and Social Security Ruling 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements."[9]    These errors regarding Plaintiff's

---

[9]    "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations

credibility severely compromised the ALJ's decisions at steps two and three, the determination of Plaintiff's RFC, and the formulation of hypothetical questions to the vocational expert. (Plf.'s Brief, id.)

In the portion of his analysis directly addressing Plaintiff's credibility, the ALJ correctly noted the two-step process set out in SSR 96-7p which is to be applied in considering a claimant's subjective symptoms. The first step is to determine if there is an underlying medically determinable physical or mental impairment which could reasonably be expected to produce the pain or other subjective symptoms. If that criterion is met, the second step is to evaluate the intensity, persistence and limiting effects of those symptoms on the claimant's ability to do basic work activities. As the ALJ explicitly noted, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [the ALJ] must make a finding on the credibility of statements based on a consideration of the entire case record." (Tr. 23.) In doing so, he considers seven factors set out in SSR 96-7p. (Tr. 24.)

Briefly summarized, the ALJ considered Plaintiff's subjective symptoms of back pain, mental impairments such as depression,

but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

11

reports to his physicians regarding trembling in his right hand, blackouts supposedly related to multiple sclerosis ("MS"), medical procedures he had refused, and use of a cane. (Tr. 24-25.) The ALJ noted explicit medical evidence, or more accurately, the absence of medical evidence to substantiate these claims. For example, Mr. Mallough testified he had told a consultative examiner, Dr. Vigna, he had multiple sclerosis. (Tr. 338; *see also* Dr. Vigna's notes on this subject at Tr. 183.) He further testified that his primary care physicians, Dr. Paul E. Reilly and Dr. Carl Scheler, had told him that symptoms such as "occurrences of like a blackout," were "falling under multiple sclerosis, and the only way to more or less really define it is they wanted to stick needles in my spine, and I refused to." (Tr. 339.)

As the ALJ points out, a review of the medical records "fails to indicate any suspicion by either doctor that the claimant has multiple sclerosis or that he has refused any diagnostic tests." (Tr. 24.) A page-by-page review of those records by the Court (Tr. 169-179, 246-256, and 263-268) reveals one reference to "MS" in Dr. Reilly's notes from July 21, 2003. At that point, he noted "? MS Dr. Scott - [Patient] has seen Dr. Wright in the past. Secretary will [check] with Dr. Wright [and] he will discuss [with] Dr. Scott [and] they will call [patient.]" There is a further comment,

12

"Myalgias (father [with] MS) T. Scott." (Tr. 176.)[10] However, there are no records in the file from Drs. Wright or Scott and Dr. Reilly did not perform any medical tests to rule out or confirm the presence of multiple sclerosis. There is a second note dating from June 25, 2003, indicating Plaintiff either had undergone or was prescribed an MRI and "spinal taps" related to his diagnosis of scoliosis,[11] but Dr. Reilly concurrently noted there was no evidence of scoliosis and there are no test results of an MRI or spinal tap. (Tr. 178.) Dr. Scheler's notes are almost illegible, but there is a single discernable reference to "MS" on July 8, 2004, in the context of a note regarding Plaintiff's chronic back pain of no obvious etiology. (Tr. 256.) In short, as the ALJ concluded, Mr. Mallough's testimony on this subject is not supported by any objective medical evidence.

Similarly, there is no medical evidence that Dr. Reilly prescribed a cane,[12] as Plaintiff testified, or that he had been diagnosed with bi-polar disorder, attention-deficit/hyperactivity

---

[10] At the hearing before Judge Kenworthy, Plaintiff testified that his mother, grandmother and youngest uncle all had multiple sclerosis. (Tr. 344.) This statement is not reflected in any physician's notes.

[11] Scoliosis is the lateral, i.e., side-to-side, curvature of the spine. See medical dictionary at Medline Plus.

[12] In May 2005, after Plaintiff's girlfriend ran over his foot with a truck, he was prescribed a cam walker and crutches. (Tr. 249-251.) Plaintiff's foot was not broken and there is no evidence of long-term ramifications from this accident. Moreover, Plaintiff testified that he used a cane due to problems with his knees, not because of pain or other difficulty with his foot. (Tr. 348.)

13

disorder, or panic attacks, again in contradiction to Plaintiff's testimony. Nor are we persuaded by Plaintiff's argument that his testimony was consistent with other evidence in the record, specifically Tr. 111-120 and 131-132, inasmuch as those documents are not medical evidence but rather two questionnaires prepared by Mr. Mallough himself.

As recognized in the Social Security Ruling relied upon by both the ALJ and Mr. Mallough, where symptoms

> suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record. . . . In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. . . . [T]he adjudicator must . . . give specific reasons for the weight given to the individual's statements.

SSR 96-7p.

Plaintiff argues that the ALJ "summarily discredit[ed] Plaintiff's subjective allegations due to a lack of objective findings." (Plf.'s Brief at 5.) To the contrary, the ALJ made it explicitly clear that he rejected Plaintiff's statements regarding the intensity, persistence and limiting effects of his medical conditions not only because there was little supporting medical evidence, but because "there are simply too many internal

14

inconsistencies as well as inconsistencies between the claimant's

testimony and the documentary records." (Tr. 25.)

As this Court has previously noted:

> In most instances, a district court will give great
> deference to the ALJ's credibility determination because
> he or she is best equipped to judge the claimant's
> demeanor and attitude. *See* Reefer v. Barnhart, 326 F.3d
> 376, 380 (3d Cir. 2003). The determination "must contain
> specific reasons for the finding on credibility,
> supported by the evidence in the case record, and must be
> sufficiently specific to make clear to the individual and
> to any subsequent reviewers the weight the adjudicator
> gave to the individual's statements and the reasons for
> that weight." Schwartz v. Halter, 134 F. Supp.2d 640,
> 654 (E.D. Pa. 2001), *quoting* SSR 96-7p. . . . This Court
> must review the factual findings underlying the ALJ's
> credibility determination to ensure that it is "closely
> and affirmatively linked to substantial evidence and not
> just a conclusion in the guise of findings." Hackett v.
> Barnhart, 395 F.3d 1168, 1173 (10ᵗʰ Cir. 2005) (internal
> quotation omitted.) However, the reviewing court will
> reject an ALJ's credibility determination only if it is
> "patently wrong." Schmidt v. Barnhart, 395 F.3d 737,
> 746-747 (7ᵗʰ Cir. 2005).

McClinsey v. Astrue, CA No. 08-23, 2008 U.S. Dist. LEXIS 102657,
\*19, n.13 (W.D. Pa. Dec. 18, 2008).

This Court has reviewed the ALJ's factual findings in which he

compared Plaintiff's testimony and written statements to the

medical record and other evidence. Judge Kenworthy clearly stated

his primary reason for discounting Plaintiff's credibility, i.e.,

the numerous internal inconsistencies and inconsistencies between

his testimony and the objective evidence. See SSR 96-7p, noting

"[o]ne strong indication of the credibility of an individual's

statements is their consistency, both internally and with other

information in the case record." Based on our own review of the

record, we cannot conclude that the ALJ's decision to find Plaintiff less than entirely credible was "patently wrong."[13]

2.   *The ALJ's analysis of Plaintiff's psychological impairments:*[14]  In four inter-related arguments, Mr. Mallough argues that the ALJ erred in his analysis and conclusions with regard to Plaintiff's ability to sustain gainful employment on a regular basis due to numerous psychological impairments.   The ALJ first erred at step two of his analysis by concluding that Plaintiff's major depressive disorder, adjustment disorder, ADHD, antisocial

---

[13]   In this section of his brief, Plaintiff argues in passing that the ALJ failed to give him a *de novo* hearing as required by the Appeals Council's notice of remand because Judge Kenworthy also referred to inconsistencies between his testimony on March 9, 2007, and in the hearing before Judge Malick.   (Plf.'s Brief at 5-6.)   Judge Kenworthy pointed out as an example of inconsistency Plaintiff's testimony before Judge Malick that he used the cane when going from his bed to the bathroom and everywhere in his house; at the hearing before Judge Kenworthy, he testified that he used the cane only when walking downstairs and denied using it outside the house.   (Tr. 24-25.)   As the Supreme Court noted in United States v. Raddatz, 447 U.S. 667, 690 (U.S. 1980) "*de novo* determination" means "an independent determination of a controversy that accords no deference to any prior resolution of the same controversy."   *See also* United States v. First City National Bank, 386 U.S. 361, 368 (1967), explaining that the phrase "review *de novo*" means "that the court should make an independent determination of the issues" and should "not . . . give any special weight to the [prior] determination of" an administrative agency.   Judge Kenworthy's reference to Plaintiff's prior testimony does not, we conclude, indicate that he failed to make an independent determination based on the updated medical record, other evidence, and testimony at the hearing which was held before him.

[14]   In several arguments, Plaintiff has consolidated the discussion of his alleged mental impairments - major depressive disorder, antisocial personality disorder, anxiety disorder (panic attacks), ADHD, and somatoform disorder (chronic pain syndrome) - with the discussion of his alleged mild mental retardation.   Because these impairments are analyzed under different criteria, we will first address the arguments as they pertain to Plaintiff's psychological impairments and then address his intellectual functioning.

16

personality disorder, and chronic pain syndrome were not "severe" as that term is defined by the Social Security Administration. The ALJ's improper and incomplete evaluation of his mental impairments and the effect of this failure on the subsequent steps of his analysis requires remand for further evaluation by a medical expert and re-consideration by the ALJ. (Plf.'s Brief at 6-7.)

Second, the ALJ failed to develop a full and fair record and improperly rejected and/or evaluated probative medical evidence; consequently, the ALJ erred in his conclusion that his impairment or combination of impairments did not meet or medically equal one of the Listings. That is, had the ALJ given greater weight to the results of a consultative mental status evaluation conducted by Dr. Vigna in November 2003, to Dr. Vigna's evaluation of Plaintiff's ability to perform work-like functions, and to other medical evidence regarding Plaintiff's psychological impairments, Plaintiff's conditions would have met or medically equaled the criteria for Listing 12.04. Contrary to the directive of the Appeals Council, the ALJ failed develop the record by obtaining additional evidence from a medical expert to clarify the nature and severity of these impairments.[15] (Plf.'s Brief at 8-11.)

---

[15] Plaintiff refers to this argument at numerous points in his brief. However, we note that the Appeals Council directed that "Upon remand the Administrative Law Judge will: . . . . Consider obtaining evidence from a medical expert to clarify the nature and severity of the claimant's impairments. . . ." (Tr. 73.) We conclude that in light of the directive to "consider obtaining evidence," the Appeals Council left this decision to the discretion of the ALJ and this Court will not disturb that decision. We further find that Plaintiff's

17

Third, the combination of the ALJ's erroneous credibility determination, his selective choice of evidence, and his failure to give proper weight to Dr. Vigna's findings led to an erroneous determination of Plaintiff's residual functional capacity. Had the ALJ properly determined Plaintiff's RFC, particularly the combination of Plaintiff's physical impairments, psychological impairments, and mild mental retardation, he would have been compelled to conclude Mr. Mallough was incapable of carrying out even the simplest work-related activities and thus presumptively disabled. Fourth, because these conditions were not incorporated in the hypothetical question posed by the ALJ at the hearing and because the ALJ explicitly rejected the responses to questions by Plaintiff's attorney which did incorporate those limitations, the ALJ's conclusion at step five is not based on substantial evidence. Therefore, at a minimum, the case must be remanded for further consideration. (Plf.'s Brief at 11-13.)

Before considering these arguments, we provide a summary of the evidence concerning Plaintiff's alleged psychological impairments. The earliest records pertaining to mental impairments date from Plaintiff's adolescence. In August 1992, when Mr. Mallough was approximately 14 years old, he began receiving psychological counseling at Family Services of Western Pennsylvania

---

failure to attend a consultative psychological exam scheduled after the case was remanded made it impossible for the ALJ to reasonably pursue this directive further.

("Family Services.") Although the records from 1992 through 1994 may be somewhat incomplete, it appears Plaintiff underwent weekly therapy sessions due to a complicated and stressful family situation, destructive behavior, and difficulty at school due to behavioral problems. Although he later reported having been prescribed Ritalin[16] for about a year (Tr. 215), there are no notes regarding medication in this portion of the record, no mental status evaluations by a psychologist or psychologist, and no formal diagnoses of mental health problems.[17] After about 18 months, Mr. Mallough was considered improved and he and his therapist began a program of terminating the treatment. During the last two or three months, Plaintiff failed to appear for several sessions and therapy was formally terminated in August 1994. (Tr. 217-243.)

There are no records of mental health treatment again until January 2002 when Mr. Mallough returned to Family Services. Following an initial assessment on January 8, 2002, Mr. Mallough failed to attend the first two therapy sessions scheduled for January 23 and February 11. (Tr. 212.) In the record of a psychiatric evaluation performed at Family Services on March 21,

---

[16] Ritalin (methylphenidate) is used as part of a treatment program for ADHD. It is one of a class of medications called central nervous system stimulants which work by changing the amounts of certain natural substances in the brain. See drugs and supplements information at Medline Plus.

[17] Later notes by Dr. Bullard refer to evaluations previously done by Family Services in April 1985, February 1989, and October 1992 (Tr. 215), but none of these reports appears in the Social Security record.

19

2002, Dr. Bullard noted Mr. Mallough's reports of having held seven jobs in the last four months, anger, arguments with his wife, the inability to hold a job due to conflict with supervisors, dropping out of school "because he could not take supervision or problems with teachers," and poor sleep. (Tr. 215.) Dr. Bullard described Mr. Mallough as appearing "slightly anxious," with thought processes that moved "at a normal tempo." He further commented that Plaintiff had "a paranoid orientation to life," but he noted no delusions. (Id.) Although Plaintiff could not give good explanations of either of two proverbs, he was able to give good abstract responses on similarities, his fund of general information was within normal limits, and he could do simple mental arithmetic. (Tr. 216.) Despite self-reports of very poor recent, recent past, and remote memory, he could recall six digits forward, four digits reversed, and two out of four items in a test of his brief recall. Dr. Bullard's diagnoses were "adjustment disorder with mixed disturbance of emotions and conduct, [rule out] antisocial personality disorder" and he questioned the previous diagnosis of attention deficit disorder. Plaintiff's Global Assessment of Functioning score ("GAF") at that point was 50.[18] Dr. Bullard

---

[18] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002). A GAF rating between 41 and 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends,

prescribed Ritalin and Paxil.[19]  (Tr. 216.)

In a therapy session on March 25, 2002, Plaintiff's affect was
described as angry, his mood low, and he reported feeling "somewhat
depressed."  He was having difficulty working and keeping a job.
(Tr. 212.)   Three more therapy sessions were scheduled between
April and November 2002, but Mr. Mallough failed to keep any of
those appointments.  (Tr. 211.)   Mr. Mallough apparently did not
immediately seek any other source of mental health treatment.
However, the record shows that his primary care physician, Dr.
Reilly, prescribed Zoloft[20] although his notes do not discuss any
mental impairments such as depression.  (Tr. 134-137, 171-179.)

In November 2003, Mr. Mallough underwent a consultative
psychological examination by state-agency psychologist Dr. John

unable to keep a job."  *See* the on-line version of DIAGNOSTIC AND
STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), Multiaxial Assessment,
American Psychiatric Association (2002), at www.lexis.com., last
visited April 2, 2009.  Neither Social Security regulations nor case
law requires an ALJ to determine a claimant's disability based solely
on his GAF score.  *See* Ramos v. Barnhart, CA No. 06-1457, 2007 U.S.
Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited
therein.

[19]  Paxil (paroxetine) is used to treat depression, panic
disorder, social anxiety disorder, obsessive-compulsive disorder,
generalized anxiety disorder, and post-traumatic stress disorder.
Paroxetine is in a class of antidepressants called selective serotonin
reuptake inhibitors ("SSRI") which work by increasing the amounts of
serotonin, a natural substance in the brain that helps maintain mental
balance.  *See* drugs and supplements information at Medline Plus.

[20]  Among other uses, Zoloft (sertraline), is used to treat
depression, obsessive-compulsive disorder, panic attacks, post-
traumatic stress disorder, and social anxiety disorder.  Like Paxil,
Zoloft is an SSRI.  *See* drugs and supplements information at Medline
Plus.

Vigna in connection with his application for Social Security benefits. Although Plaintiff relies heavily on this report in his arguments regarding his psychological impairments, Dr. Vigna had few comments on that subject, concentrating instead on Plaintiff's intellectual functioning as discussed in the next section. Plaintiff reported to Dr. Vigna that he took "many medications for his mental health condition," but there is no evidence of such ongoing medication except Dr. Reilly's standing prescription for Zoloft.[21] He also told Dr. Vigna that when he was younger he was diagnosed with ADHD and now "they" were telling him "it's turning into bi-polar." (Tr. 183). He reported such severe anxiety when around other people that he had panic attacks. (Tr. 183-184.) As to his work history, Mr. Mallough stated he had held approximately 75 jobs in the past and was fired from his longest job taking care of an elderly man after he fell asleep on duty. He further commented that he had been fired from most jobs for "not showing up, not cooperating, slipping out on them." (Tr. 184.) In the clinical interview, Mr. Mallough reported he could perform most activities of daily living, at least to a moderate degree, although due to his anxiety, he did not go shopping or use public transportation, and he needed help when paying his bills. His

---

[21] Pharmacy reports and Plaintiff's own records for the period December 1, 2004, through January 27, 2007 (Tr. 134-139, 150-152), show that Dr. Reilly and later Dr. Scheler regularly prescribed Zoloft 50 mg. Plaintiff was prescribed another anti-depressant, amitriptyline, beginning in August 2005 by Drs. Firoz and Bajwa whose medical reports do not appear in the record. (Tr. 150.)

22

social functioning was limited; that is, he was able to "get along with others at least to a degree" but he did not try to initiate new social contacts. His social maturity appeared to be "rather low" and by his own report, he had a very low frustration tolerance, his past interactions with persons in authority were poor, he did not interact with co-workers, and had difficulty completing tasks. (Tr. 184-185.) Dr. Vigna did not suggest any diagnoses of Mr. Mallough's psychological impairments. He did, however, prepare a "Medical Source Statement of Ability to do Work-Related Activities (Mental)" in which he indicated that Plaintiff's mild mental retardation and his other mental impairments would result in "marked" difficulty[22] carrying out short, simple instructions, making simple work-related decisions, interacting appropriately with co-workers, and responding appropriately to changes in a routine work-setting; he would have "extreme" difficulty[23] understanding, remembering, and carrying out detailed instructions, interacting appropriately with the public and with supervisors, and responding appropriately to work pressures in a usual work setting. (Tr. 181.)

In a state-agency file review performed in December 2003, Dr.

---

[22] "Marked" is defined in the form as "serious limitation in this area. The ability to function is severely limited but not precluded." (Tr. 180.)

[23] "Extreme" is defined in the form as "major limitation in this area. There is no useful ability to function in this area." (Tr. 180.)

23

Edward Zuckerman noted that with regard to his psychological impairments, while Plaintiff "may have some irritability and lessened frustration tolerance and some mild social anxiety these do not rise to the level of a diagnosis and do not significantly limit his ability to work." He further concluded Plaintiff's impairments did not severely affect his basic memory processes, he could work on schedule and at a consistent pace, make simple decisions, and "carry out very short and simple instructions." Although Plaintiff experienced social anxiety and discomfort around strangers, he could sustain an ordinary routine without special supervision, function in production oriented jobs which required little independent decision making, and perform repetitive work activities without constant supervision. (Tr. 191.)

With regard to Dr. Vigna's conclusions regarding Plaintiff's inability to make occupational, performance and social adjustments and to perform other work related activities, Dr. Zuckerman found these opinions inconsistent with all of the other medical and non-medical evidence compiled to date. Therefore, he considered Dr. Vigna's findings an overestimate of the severity of Plaintiff's restrictions and concluded his report should not be given great weight. (Tr. 191.) Dr. Zuckerman also evaluated Plaintiff's functional limitations in his activities of daily living, ability to maintain social functioning, and ability to maintain concentration persistence or pace. He found no more than mild

24

limitations in any of those areas, nor was there evidence of any
repeated episodes of decompensation, each of an extended duration.
(Tr. 204.)

In July 2005, after a hiatus of more than three years and
shortly before the hearing before Judge Malick, Mr. Mallough
returned to Family Services for behavioral health treatment. (Tr.
247.)  In the initial interview, he complained of stress due to
marital problems, the recent deaths of his mother and step-father,
the threat of eviction, and not being able to afford some of his
medications. (Tr. 306.)  At the time, he reported he was working
full-time more than 30 hours a week as the assistant manager of a
fast food restaurant.²⁴  (Tr. 308, 313.)  In the mental status
assessment, his therapist noted although he was distractible, had
difficulty concentrating, demonstrated poor insight and judgment,
and reported poor recent memory, his intellect, abstract thought,
and interview behavior were normal. (Tr. 314-315.)  His diagnoses
at that time were major depressive disorder, recurrent, severe with
psychotic features, rule out bi-polar disorder, and his GAF was 43,
indicative of serious symptoms. (Tr. 304.)   Mr. Mallough was
discharged from treatment on October 31, 2005, after he failed to
attend the next three conferences scheduled after his initial
interview. (Tr. 306.)  He later testified he had stopped attending

---

²⁴ At the hearing before Judge Malick on August 24, 2005,
Plaintiff testified that his last full-time job had been providing in-
home care to the elderly (Tr. 366-367) and did not mention this job.

therapy because he was not pleased with his therapist and case worker and because he had to "fight" to get an appointment. (Tr. 337-338.)

As the ALJ noted, in Plaintiff's previous application for Social Security benefits, Mr. Mallough did not allege any psychological impairments. (Tr. 18.) In the application considered by Judge Malick and later by Judge Kenworthy, Plaintiff alleged disability due to attention deficit disorder, but did not mention major depressive disorder, panic attacks, chronic pain syndrome, or antisocial personality disorder. (Tr. 99.) The record shows that other than psychological counseling during adolescence, Plaintiff received no regular mental health treatment after August 1994 until his short-lived return to Family Services in January 2002. Other than Zoloft, prescribed by Dr. Reilly and later Dr. Scheler (Tr. 135), and Dr. Vigna's consultative exam in November 2003, there are no records of mental health treatment for the period March 2002 through July 2005, when he returned to Family Services but again failed to keep his appointments, nor between July 2005 and the date of the hearing, March 9, 2007. Although he testified at the hearing that he was currently attending weekly therapy sessions at Family Behavioral Services with his girlfriend, there is no evidence of such treatment in the medical record and he admitted he was taking no medication for any mental health condition at the time. (Tr. 336-337.)

26

Although Plaintiff relies heavily on Dr. Vigna's conclusions that he had been "fired from many employment situations, never spoke with coworkers and showed very low frustration tolerance" (Tr. 181) as evidence showing it would be highly unlikely Plaintiff would be able to perform on a day-to-day basis in a normal work environment, we note that all of the "evidence" relied upon by Dr. Vigna in this portion of his report comes solely from Mr. Mallough's own statements. We also note that neither Dr. Reilly nor Dr. Scheler recommended that Plaintiff receive psychiatric treatment and that when therapy was attempted, he quickly failed to follow through. Finally, after the case was remanded by the Appeals Council, Judge Kenworthy ordered a second consultative psychiatric examination. (Tr. 22.) Mr. Mallough failed to appear for the examination which had been scheduled for December 7, 2006, and offered neither Judge Kenworthy nor this Court any reason for failing to keep that appointment.

According to Social Security regulations, an impairment is severe if it "significantly limits" the claimant's "physical or mental ability to do basic work activities." In contrast, an impairment is considered no more than "a slight abnormality" if it has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. See 20 C.F.R. §§ 404.1520(c) and 416.920(c). In short, the mere diagnosis of an impairment is

insufficient to establish eligibility for Social Security benefits. Phillips v. Barnhart, No. 03-2236, 2004 U.S. App. LEXIS 4630, * 14 (3d Cir. Mar. 10, 2004). "Rather, a claimant must show that the impairment resulted in disabling limitations." Id. Here, Plaintiff has presented no evidence, other than Dr. Vigna's consultative report, that any of his psychological conditions are so severe that they "significantly limit" his ability to do basic work activities. Judge Kenworthy, having considered all of the evidence, agreed with Dr. Zuckerman that Plaintiff had no more than mild limitation in his activities of daily living, social functioning and ability to maintain attention, concentration and pace and that he could perform repetitive work activities without constant supervision. (Tr. 23, 25.) Having also considered the relevant medical evidence of record, we find that the ALJ did not err in finding that Plaintiff's alleged mental impairments were not severe, in declining to give great weight to Dr. Vigna's opinion, or in the formulation of Plaintiff's residual functional capacity as it pertained to his psychological limitations.

3. *The ALJ's analysis of Plaintiff's intellectual functioning:* Plaintiff reiterates his argument that the ALJ erred by rejecting Dr. Vigna's opinion that his combination of psychological impairments, together with mild mental retardation, precluded Mr. Mallough from performing typical work-related functions on an ongoing basis. (Plf.'s Brief at 6-7.)

28

Second, he argues that the ALJ erred by not giving Dr. Vigna's opinion significant weight; that is, contrary to the ALJ's conclusion that the test results on an intelligence test administered in November 2003 were "invalid," the totality of the evidence surrounding that test, together with evidence of mild mental retardation from Plaintiff's school records and his own testimony regarding limitations on his activities of daily living, indicate that Plaintiff's ability to perform substantial gainful activity on an on-going basis is more compromised than the ALJ was willing to acknowledge. (Plf.'s Brief at 7-8.)

Third, the ALJ erred by finding that Plaintiff's mental retardation did not satisfy Listing 12.05. Had the ALJ accepted the IQ test scores provided by Dr. Vigna, the ALJ would have been compelled to conclude Plaintiff satisfied the criteria of that Listing. (Plf.'s Brief at 8-11.)

Finally, the ALJ erred by failing to incorporate Plaintiff's limited mental capacity into the hypothetical questions posed to the vocational expert at the hearing. Consequently, the answers to those questions cannot constitute substantial evidence to support the ALJ's conclusion that Plaintiff could return to his prior work as a janitor or perform other unskilled light work. (Plf.'s Brief at 11-13.)

We begin with a brief chronological summary of the evidence in the record regarding Plaintiff's alleged mental retardation. The

first are school records dating from 1993 through 1994 when he performed very poorly in seventh and eighth grade. However, in 1994-1995, when Plaintiff was in the ninth grade, he received As, Bs, and Cs in all but two courses and maintained a QPA of 2.7, indicating a "C-plus" average. In tenth grade, he received Bs and Cs in all courses except auto technology and physical education and had a C average. His courses were a combination of mainstream and learning support instruction. (Tr. 153-154, 156.)

The record includes a Individual Education Program ("IEP") plan dated May 16, 1996, prepared in anticipation of Plaintiff's senior year (1996-1997). He was scheduled to be in mainstream classes 73% of the time and receive what was described as "supplemental support" in his other classes. At that time, his counselors anticipated that he would begin competitive employment or attend a technical trade school after graduation. (Tr. 155-167.) In May 1997, as part of his IEP evaluation when he was in the twelfth grade, Plaintiff was observed in an English class. The teacher concluded that he

is achieving at expected level in his current placement.. . . [He is] inconsistent in work effort and in need of structured activities. Problem-solving skills are appropriate for level of functioning. Peer relationships are good. Progress is satisfactory in mainstream subjects and special education. Level of support in regular education academic areas is moderate. . . .He is instructed at 4th grade level in reading and 5th grade level in math based on curriculum based assessment.

(Tr. 258.)

30

Mr. Mallough's strengths were described as "positive peer relationships, responds to positive reinforcement, following rules, positive relationships with adults, [and] social skills;" on the other hand, he needed improvement in motivation. (Tr. 259.)

As noted above, Plaintiff had received approximately two years of counseling from Family Services beginning in August 1992. There are references to behavioral issues at school and to his participation in special education classes, but no problems stemming from mental retardation. In January 2002, when Mr. Mallough underwent the psychiatric evaluation by Dr. Bullard, his intellectual functioning was estimated to be "in the average range." (Tr. 215-216.)

During the initial consideration of his application for Social Security benefits, Plaintiff underwent intelligence testing as part of Dr. Vigna's consultative examination. The Wechsler Adult Intelligence Scale-Third Edition revealed a verbal performance score of 66, a performance score of 60, and a full scale score of 61, which Dr. Vigna described as "extremely low." (Tr. 185.) He found these scores "to be valid and. . .consistent with his developmental history and reported degree of functional limitations;" he also indicated that Plaintiff had been cooperative and put forth good effort during the testing procedure. (Id.) Other information about Plaintiff's intellectual functioning was noted in the narrative portion of Dr. Vigna's report. For

31

instance, Plaintiff reported that he had been "in full-time special education throughout his school years" (Tr. 184), a direct contradiction to his school records which showed a combination of mainstream and learning support classes. He also reported that he dropped out of high school in the tenth grade, another contradiction with his school records and with his own statement in another interview that he dropped out four days before graduation. (*Compare* Tr. 313.) Based on Plaintiff's history, presentation and current test scores, Dr. Vigna concluded that Mr. Mallough "seems to qualify for the diagnosis of mild mental retardation," and that this "lifelong difficulty" would continue. (Tr. 187.)

In the file review performed by Dr. Zuckerman in January 2004, he noted the inconsistencies between Dr. Vigna's evaluation of Plaintiff's intellectual functioning and other evidence in the record. At his request, representatives from the Social Security Administration spoke with Dr. Reilly and Ms. Joyce Orczyk who was assisting Mr. Mallough with the SSI application process. (Tr. 193; 43.) The notes from the conversation with Dr. Reilly state,

According to the doctor, the claimant has never exhibited any manifest cognitive defect on examination and the records indicate no prior diagnosis of [mental retardation.] The claimant is able to participate in [the] exam process, provide information as requested, and comprehends information without the need of any special assistance.

(Tr. 140, note of December 4, 2004.) Similarly, Ms. Orczyk reported that

32

although she was unable to clinically assess the claimant's cognitive ability, she said that she would not be surprised to learn that his transcripts did not indicate a diagnosis of [mental retardation.] Although the claimant reported he relies heavily on his live-in girlfriend with whom he shares the care of their children, Ms. Orczyk's file does indicate the claimant held a valid driver's license through July 2003.

(Tr. 141, note of December 4, 2004.)

Based on his review of the entire record to date, Dr. Zuckerman concluded that although Plaintiff's current[25] IQ scores were in the sixties, "previous scores and academics, current [activities of daily living] and the observations of his physician suggest that a Borderline IQ diagnosis might be more appropriate." As noted in the previous section, Dr. Zuckerman concluded that despite limitations from a combination of psychological impairments and borderline intelligence, Mr. Mallough was not precluded from "meeting the basic mental demands of competitive work on a sustained basis." (Tr. 191-192.)

Judge Malick did not state clearly in his opinion the weight given to the reports of Dr. Vigna and Dr. Zuckerman, but did include "mild mental retardation," Dr. Vigna's diagnosis, among Plaintiff's severe impairments. (Tr. 33.) He did not evaluate this condition under Listing 12.05 or offer any explanation as to

---

[25] According to the ALJ's decision, a standard intelligence test administered in April 1985 when Plaintiff would have been 6 years old yielded a score of 94, within the average range. (Tr. 22; *see also* reference to this test in Dr. Zuckerman's notes, Tr. 206, and in the Appeals Council's notice of remand, Tr. 72.) However, the Court has been unable to identify this test in the current record.

why, in light of Plaintiff's other severe limitations, he did not find that the relevant listing had been met.

After the case was remanded, Judge Kenworthy ordered a second consultative examination at which "different types of tests" would be administered "in order to further clarify the nature of [Mr. Mallough's] intellectual capacity." (Tr. 22.) As noted above, Plaintiff failed to appear for that examination. (Tr. 139.)

Listing 12.05, mental retardation, begins with an introductory paragraph setting forth the diagnostic description for mental retardation. According to this so-called "capsule definition," mental retardation refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05. The Listing also contains four sets of criteria, A through D; if the claimant's level of mental retardation satisfies any one of those four sets of criteria, the ALJ should conclude at step three that the impairment satisfies the Listing.

We note initially that Plaintiff does not explain which of the four sets of criteria he claims to have satisfied in order to meet Listing 12.05. We conclude, however, based on his reported IQ scores within the range of 60 to 70, that he could only satisfy Listing 12.05C or 12.05D.

34

As succinctly stated by the United States Court of Appeals for the Third Circuit, a claimant satisfies the three-prong test of Listing 12.05C when he shows he "i) [has] a valid verbal, performance or full scale IQ of 60 through 70, ii) [has] a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) [can] show the mental retardation was initially manifested during the developmental period (before age 22)." Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003). Only one score within this range is necessary to satisfy the first part of this test. *See* Burns v. Barnhart, 312 F.3d 113, 125, n.6 (3d Cir. 2002), noting that the claimant receives the "benefit of the doubt" inasmuch as the lowest score on a multi-part IQ test is the score used in the rest of the analysis. This portion of the regulations also states that the IQ assessment should be accompanied by a narrative report which indicates "whether the IQ scores are considered valid and consistent with the [claimant's] developmental history and the degree of functional limitation." Here, there is no question that Plaintiff's IQ scores on the test administered in November 2003 satisfies this prong of the Listing and Dr. Vigna clearly stated his belief that the scores were valid and consistent with other evidence.

The second prong of Listing 12.05C requires evidence of impairment(s) which impose "additional and significant work-related

limitations of function." This prong is satisfied if the ALJ identifies one or more severe impairments in addition to the claimant's mental impairment at step two of his analysis. In August 2000, the SSA clarified that it always had intended the phrase "to mean that the other impairment is a 'severe' impairment as defined in §§ 404.1520(c) and 416.920(c)." *See* <u>Markle</u>, 324 F.3d at 188, *quoting* "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," 65 Fed. Reg. 50746, 50772 (Aug. 21, 2000). Here, at step two, the ALJ identified Plaintiff's chronic back pain of undetermined etiology as a second severe impairment. Thus, we conclude that Plaintiff satisfies the second prong of Listing 12.05C.

The third prong of Listing 12.05C is satisfied when medical and other records dating from before the claimant was age 22 show evidence of mental retardation. This documentation can include school records reflecting IQ test scores or a history of special education classes. *See*, e.g., <u>Christner v. Astrue</u>, 498 F.3d 790, 793 (8th Cir. 2007) (claimant who dropped out of school at a low grade level despite participation in special education classes "likely" met the burden of establishing onset before age 22); <u>Maresh v. Barnhart</u>, 438 F.3d 897, 900 (8th Cir. 2006) (struggling in special education classes, having trouble with reading, writing and math, and dropping out of school in the ninth grade constituted evidence of mental retardation prior to age 22); and <u>Blackwell v.</u>

Comm'r of Soc. Sec., CA No. 08-374, 2008 U.S. Dist. LEXIS 90303
(W.D. Pa. Nov. 6, 2008) (claimant dropped out at the middle school
level, required "6 or 7 years" and the assistance of a tutor to
complete a GED, and presented evidence of an IQ score of 70 when he
was 11 years old.) Other evidence showing the onset of mental
retardation prior to age 22 includes qualification for SSI benefits
as a child based on that impairment. *See* Elder v. Comm'r of Soc.
Sec., CA No. 07-59, 2008 U.S. Dist. LEXIS 60929, *25-*26 (W.D. Pa.
July 31, 2008).

We conclude that Plaintiff has failed to satisfy this prong of
Listing 12.05C. Plaintiff was born in 1978 and therefore would
have been 22 in December 2000. In short, there is no evidence from
before that date, either in his school records, the notes from his
medical history and from his therapy as a teenager, or in Dr.
Vigna's report which reflects onset of the impairment before age
22. Although he was in special education classes as a child, even
Plaintiff conceded that such a placement was due to "behavior" (Tr.
105), rather than limited intellectual function, and other parts of
the record show that lack of motivation for learning, inconsistency
of performance, and need for a structured learning environment were
the primary reasons for learning support.

Moreover, the regulations and case law are clear that an ALJ
may reject the results of an IQ test which are shown to be
"invalid." In arriving at his determination of whether an IQ score

37

is valid, i.e., the score is "an accurate reflection of [a claimant's] intellectual capabilities," the ALJ is to consider the entire record before him. Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir. 2007); Markle, 324 F.3d at 186. Here, the ALJ rejected the scores from November 2003 as invalid based on his comparison of (1) Plaintiff's high school grades and his ranking within the class, (2) results of IQ tests performed when Plaintiff was in kindergarten, (3) levels of function in his activities of daily living which were inconsistent with Dr. Vigna's diagnosis of mild mental retardation, and (4) Plaintiff's failure to undergo the second battery of intelligence tests. (Tr. 21-22.) We find this explanation properly encompasses the entire record. Although this Court may have reached a different conclusion, we conclude the ALJ did not err by finding that the results of Dr. Vigna's test did not accurately reflect Plaintiff's intellectual abilities and thus, Plaintiff did not satisfy Listing 12.05C.

We may quickly consider the criteria of Listing 12.05D. As with Listing 12.05C, the evidence must show onset of mental retardation prior to age 22; as noted above, there is no such persuasive evidence in Mr. Mallough's records. Second, in addition to IQ scores in the range of 60 to 70, in order to satisfy Listing 12.05D the claimant must show at least two of four criteria which are the same as those needed to satisfy Listing 12.04, briefly referred to in the previous section, i.e., marked restrictions in

activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, or repeated episodes of decompensation, each of extended duration. As discussed above, we conclude that ALJ did not err by agreeing with Dr. Zuckerman that Plaintiff demonstrated no more than mild or moderate limitation in any of these categories. (Tr. 23.)

Finally, we consider Plaintiff's argument that the hypothetical questions posed to the ALJ failed to incorporate his limited intellectual functioning. The questions to the vocational expert limited Plaintiff to "simple work of a simple, repetitive nature." (Tr. 354.) Even Dr. Vigna concluded that Plaintiff was no more than moderately limited in his ability to "understand and remember short simple instructions." (Tr. 181.) As discussed above, his conclusion that Plaintiff would have marked limitation in being able to carry out such instructions is inconsistent with his academic performance, past work history, and activities of daily living. On the other hand, both Dr. Bullard and Dr. Zuckerman concluded that Plaintiff functioned at an average - or, at a minimum, borderline -- intellectual level and thus was assumed to be capable of working at the level proposed by the ALJ in his hypothetical question at the hearing. We find that the ALJ did not err in finding that Mr. Mallough could perform "work of a simple, repetitive nature" despite his intellectual limitations.

Having considered the ALJ's analysis vis-a-vis the entire record, we find he did not err (1) in concluding that Plaintiff demonstrated borderline intellectual functioning rather than mild mental retardation; (2) by finding Plaintiff did not meet Listing 12.05C or 12.05D; (3) in giving Dr. Vigna's report less than controlling weight and by finding invalid the results of the IQ tests he administered; and (4) by relying on the vocational expert's testimony that Plaintiff could perform his past work as a janitor or other light unskilled work despite his intellectual limitations.

4. *The ALJ's consideration of a Department of Welfare disability form:* Plaintiff's final argument is that the ALJ failed to provide "persuasive contradictory evidence" to counter the opinion of Dr. Reilly who completed an employability assessment form for the Pennsylvania Department of Welfare in which he indicated Plaintiff was temporarily disabled for the period December 2001 through December 31, 2003,[26] due to myalgias and peptic ulcer disease. According to Plaintiff, this evaluation is totally consistent with the doctor's contemporaneous medical notes. (Plf.'s Brief at 7-8, *citing* Tr. 244-245.)

We disagree that Dr. Reilly's other medical notes show that

_____

[26] The Court questions the starting date of the alleged disability period inasmuch as Dr. Reilly did not begin treating Plaintiff until June 9, 2003, and could therefore not ascertain his disability before that date.

Plaintiff's chronic muscle pain and peptic ulcer disease were so severe as to preclude all forms of employment under Social Security regulations. When Dr. Reilly prepared this form, he had been treating Plaintiff for less than two months. One reason a treating physician's opinion is generally given great weight is the recognition that such an opinion reflects "expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (internal quotation omitted.) A two-month period can hardly be considered "a prolonged period of time." Moreover, although "an ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, [he] may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Id. While there are passing references to muscle pains in Dr. Reilly's notes, there is no explanation in either the form or in his notes as to why he considered Plaintiff's myalgias disabling.

Furthermore, it is well-established that decisions on certain issues - including the question of whether a claimant is able to work - are reserved to the Commissioner. *See* "Medical Source Opinions on Issues Reserved to the Commissioner," SSR 96-5p. Thus, a physician's opinion that an individual is disabled is not entitled to controlling weight. Smith v. Comm'r of Social Sec., No. 05-3533, 2006 U.S. App. LEXIS 10896, *15 (3d Cir. May 1, 2006),

41

*citing* 20 C.F.R. § 404.1527(e). The United States Court of Appeals for the Third Circuit has also recognized that "[an] opinion expressed by checking a box on a form is conclusory in nature." Phillips, 2004 U.S. App. LEXIS 4630, \* 16, n. 9, *citing* Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) for the principle that "a form report that requires a physician only to check a box or fill-in blanks is not substantial evidence by itself." To the extent a physician actually opines that an individual is disabled when he checks a box on a form, such an opinion is entitled to controlling weight only if it is well-supported by clinical and laboratory evidence and is not inconsistent with other substantial evidence of record. Phillips, id., *citing* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) when considering exactly the same type of state disability form.

On the other hand, the rules also provide that "adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . . [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p; *see also* Summerville v. Astrue, CA No. 07-842, 2008 U.S. Dist. LEXIS 38412, \*30-\*31 (W.D. Pa. May 8, 2008). Here, the ALJ explicitly discussed the employability assessment form and applied the relevant law correctly with regard to the weight he should give to Dr. Reilly's "opinion" that Plaintiff was disabled due to

42

myalgias and peptic ulcer disease.    (Tr. 19 and 25.)

Finally, the Court is unaware of any regulation or case law which requires the ALJ to provide "persuasive contradictory evidence" to contradict a physician's description of a patient as "disabled."   Rather, the rule is that an ALJ may not reject a treating physician's opinion on a *medical* question unless he identifies the contradictory evidence in the record on which he relies.  Burnett v. Commissioner of SSA, 220 F.3d 112, 121 (3d Cir. 2000) (emphasis added); Smith, 2006 U.S. App. LEXIS 10896 (unlike a medical opinion regarding the nature and severity of an individual's impairments, no special significance is given such an opinion as to the question of disability *per se*.)    Inasmuch as Judge Kenworthy not only discussed Dr. Reilly's conclusion that Plaintiff was "temporarily disabled," but also cited to and properly applied the relevant Social Security regulations, we conclude he did not err in giving that opinion "no substantial weight."

Having considered each of Plaintiff's arguments, we find no reason to remand this case due to errors on the part of the ALJ. Defendant's motion for summary judgment is therefore granted and Plaintiff's motion is denied.  An appropriate order follows.

April ___9___, 2009

*William L. Standish*
William L. Standish
United States District Judge

43